AMERICAN GRAIN TRIMMERS,
INC., and Frank Gates–
Acclaim, Petitioners,

v.

OFFICE OF WORKERS' COMPEN-
SATION PROGRAMS, and Ma-
rian Janich, Respondents.

• No. 97–3080.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 17, 1998.

Decided June 21, 1999.

Gregory P. Sujack (argued), Garofalo, Schreiber & Hart, Chicago, IL, for Petitioner.

Robert T. Newman (argued), O'Connor, Schiff & Myers, Chicago, IL, Shelby Hallmark, Dept. of Labor, Office of Workers' Compensation, Washington, DC, Carol A. De Deo (argued), Dept. of Labor, Washington, DC, for Respondent.

Thomas O. Shepard, Jr., Department of Labor, Washington, DC, for Party-in-Interest Benefits Review Bd.

Before POSNER, Chief Judge, and BAUER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.[*]

DIANE P. WOOD, Circuit Judge.

Like a number of other federal statutes, the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 et seq., establishes a compensation scheme for workers who suffer injury or death on the job. In order to facilitate the initial task of a claimant under the Act, there is a statutory presumption of coverage that is triggered if certain basic facts can be established. This case concerns the next step in the process: what exactly must an employer do to rebut that presumption by "substantial evidence to the contrary," and whether the employer here met that burden.

**I**

Paul Janich worked for approximately 40 years as a grain trimmer for petitioner American Grain Trimmers, Inc. (AGT), and for all but his first two years he was a foreman. The grain trimmers' job is to assist in loading grain onto barges for shipping on the Great Lakes. As a foreman, Mr. Janich was responsible for supervising the process of filling the barges with grain. This required him to estimate how much grain a barge would hold (usually from 44,000 to 60,000 bushels, or 1,100 to 1,500 tons), to direct the crew to distribute the load so that the barge would not list, and to ensure that the depth of the boat's keel below the water line did not exceed the applicable draft limitations. In order to achieve the proper balance, the foreman holds back a portion of the estimated grain the barge will take so that it can be used for final adjustments. In addition, the foreman provides occasional assistance to the other grain trimmers, makes sure enough union members show up to do the work, and arranges for replacement workers if necessary.

The summer of 1992 was a busy one for the grain trimmers in Chicago. Mr. Janich, whose health history we describe in more detail in a moment, returned to work after a lengthy absence on July 6, 1992. Because of his seniority, he was able to work long hours; in the 38 days between July 6 and his death on August 12, 1992, he worked between 29 days (217.5 hours) and 33 days (258.5 hours). On the day before the fatal incident, Mr. Janich went home from work between 3:00 and 4:00 p.m. and told his wife he was tired. The next morning, he woke up at 7:00 a.m. and started work at 8:00 a.m. It was raining intermittently. Before he broke for lunch at noon, his crew had finished loading one barge. After lunch, they began loading a second one, while Mr. Janich (as was common) monitored their progress by radio from the nearby office. By 1:30 p.m., it was raining hard. This was a serious problem for the loaders, because the grain needed to be kept dry. Mr. Janich and a Department of Agriculture inspector came out of the office and instructed the crew to stop loading and leave the barge, so that the elevator workers could close the hatch-

---

[*] Circuit Judge Cummings did not participate in the consideration or decision of this case.

**813**

es. While Mr. Janich stood on the dock watching this process, he collapsed. Several people tried to resuscitate him, and he was rushed away by an ambulance, but he never recovered. The death certificate reported that he had died of cardiopulmonary arrest due to dilated cardiomyopathy and diabetes mellitus.

Mr. Janich indeed had suffered from heart problems, and serious ones, for a long period of time. His difficulties first surfaced in 1980, when he underwent medical tests for chest pain. For some 30 to 40 years, he had been a 2–3 pack-a-day smoker, but he had reduced his smoking to 15 cigarettes per day by the time of the tests. The tests revealed that at some uncertain time in the past, he had suffered an inferior wall myocardial infarction (*i.e.*, a heart attack). In 1981, Dr. Conrado Castor, who was board certified in internal medicine and cardiovascular disease, began treating him for that condition. In April 1981, Dr. Castor diagnosed him with ventricular arrhythmia and prescribed Quinaglute, a drug, to control the heart irregularities. By 1987, Mr. Janich had also developed intermittent claudication, a deficiency in the blood flow to leg muscles due to the obstruction of the arteries that supply that area. The year 1990 brought a diagnosis of diabetes mellitus, for which he also received prescription medicine. In November 1991, Mr. Janich developed mycoplasma bronchitis with chronic obstructive pulmonary disease and was hospitalized for almost two weeks. While he was in the hospital, Dr. Castor also checked his cardiac condition again, and discovered congestive heart failure, dilated cardiomyopathy, and arrhythmia. In lay terms, Mr. Janich had a dilated, enlarged, and weak heart.

After the November 1991 hospitalization, Mr. Janich did not return to work until July 6, 1992, as noted above. By March 1992, Dr. Castor detected some improvement in the heart functioning, although it was still not good. In May 1992, Dr. Castor examined Mr. Janich and found his condition was stable, meaning that he had no heart failure, arrhythmias, shortness of breath, angina, or chest pain. This did not mean Mr. Janich had been restored to perfect health; it just indicated that Dr. Castor found no acute condition during the examination.

## II

After Mr. Janich's death, his widow Marian Janich (respondent here) filed a claim for death benefits under LHWCA § 9, 33 U.S.C. § 909. Administrative Law Judge (ALJ) Robert G. Mahony held a hearing pursuant to LHWCA § 19(d), 33 U.S.C. § 919(d), at which Mrs. Janich and AGT submitted lay and expert evidence. Under § 9, death benefits are payable to the eligible survivors of an employee whose death is the result of a workplace injury. Like most claimants, Mrs. Janich attempted to establish her right to benefits by taking advantage of the statutory presumption created in § 20(a) of the Act, 33 U.S.C. § 920(a). In order to do so, she had to establish that her deceased husband suffered a harm and that either a workplace accident occurred or that conditions at the workplace existed that could have caused the harm. (This is sometimes also referred to as the "*prima facie* case" that the claimant must establish.) Here, the ALJ found that Mrs. Janich had done so. He relied on a number of facts from the record: (1) a harm obviously occurred to Mr. Janich when he collapsed and died; (2) Mr. Janich died during the course of employment; (3) Dr. Castor's testimony, which the ALJ credited, showed that either physical exertion or workplace stress could have caused Mr. Janich's heart attack; and (4) in the moments before his death, Mr. Janich walked to the barge and ordered, perhaps by shouting, that the loading stop because of heavy rain, activities that involved both physical exertion and stress.

Section 20(a), however, merely creates a presumption that the claim comes within the Act, and the employer is entitled to

rebut it. In his principal opinion in the case, the ALJ described the employer's burden as follows:

Once Claimant establishes a *prima facie* case, the burden shifts to Employer to go forward with countervailing evidence to rebut the presumption that decedent's death was caused or aggravated by his employment. If the presumption is rebutted, it drops from the case and the claim must be decided on the record as a whole.

OWCP No. 10–32147 at 12 (Mar. 1, 1996). The ALJ also made a statement about the type of evidence the employer needed to produce in order to overcome the § 20(a) presumption: it had to be "specific and comprehensive evidence, not speculation." *Id.*

On the record before him, the ALJ concluded that AGT had not sustained its burden. AGT's principal witness was Dr. Richard J. Carroll, who qualified his opinion about the cause of Mr. Janich's death so much that the ALJ concluded it was insufficient to rebut the presumption. For example, while Dr. Carroll testified that Mr. Janich probably experienced sudden cardiac death from a lethal cardiac arrhythmia, and that there was no reason to believe that his occupation "in any way caused or aggravated the situation leading to his death," Dr. Carroll also said that "to say exactly what the cause of death is is speculative at best." *Id.* at 10–11. In addition, the ALJ found that Dr. Carroll's conclusion that Mr. Janich's death was unrelated to his work was undermined by the doctor's concession that he did not know if the cumulative effect of the amount of time Mr. Janich had worked in the 38 days prior to his death could have been a precipitating cause of his death. All in all, the ALJ chose to credit Dr. Castor's account over that of Dr. Carroll (and for that matter over that of Dr. Nathaniel Greenberg, who also testified for Mrs. Janich) and found that AGT had not successfully rebutted the presumption.

With the presumption unrebutted, the ALJ ruled that Mrs. Janich was entitled to benefits. Ordinarily, that would have meant 50% of Mr. Janich's average weekly wage payable during Mrs. Janich's widowhood (with other adjustments if there were surviving children), plus two years' compensation in a lump sum upon remarriage, and reasonable funeral expenses not exceeding $3,000. LHWCA § 9(a), (b), 33 U.S.C. § 909(a), (b). The statute also makes provision for cases like Mr. Janich's, however, where the employee was, unfortunately, an accident waiting to happen. See LHWCA § 8(f), 33 U.S.C. § 908(f). Under that section, if the total permanent disability or death of an employee is "found not to be due solely to [the workplace] injury" but was in part caused by a preexisting condition, then the *employer's* duty to make compensation payments is limited to 104 weeks only. Under § 8(f)(2), the employee or his survivor entitled to benefits receives the balance from a special fund established under § 44 of the Act, 33 U.S.C. § 944. It was undisputed in Mr. Janich's case that AGT was entitled to § 8(f) relief, and the ALJ so ordered.

Matters became somewhat confused when the ALJ issued a second Decision and Order subsequent to motions for reconsideration filed by both parties. In that order, the ALJ adjusted the base wage rate for Mrs. Janich's benefits, and he denied AGT's challenge to his conclusion that the § 20(a) presumption had not been rebutted. Specifically, ALJ Mahony rejected AGT's argument that he required the employer to present more evidence to rebut the presumption than he should have, under the LHWCA and applicable case law. The language used in this second order is confusing and possibly conflicting. On the one hand, the ALJ stated that "I agree with Employer that the presumption created by Section 20(a) is a 'bursting bubble' insofar as it drops from the case once it is rebutted." 30 BRBS 547(ALJ), 548 n. 2 (1996). On the other hand, the ALJ also stated that "Section

20(a), once invoked, shifts the burden of *proof* to employer on the issue of causation...." *Id.* at 549. In the final analysis, however, the ALJ reiterated that he had found the presumption unrebutted because the employer produced only Dr. Carroll's speculations about the cause of Mr. Janich's death.

AGT then appealed to the Benefits Review Board (BRB), which affirmed the ALJ's decision to award benefits. The BRB first found that substantial evidence supported the ALJ's decision that Mrs. Janich established her *prima facie* case and was entitled to the § 20(a) presumption. It then described the employer's burden as follows:

> Once the Section 20(a) presumption is invoked, the burden shifts to the employer to rebut the presumption with substantial evidence.... It is employer's burden on rebuttal to present specific and comprehensive evidence sufficient to sever the causal connection between the injury and the employment.... Where aggravation of a pre-existing condition is at issue, employer must establish that work events neither directly caused the injury or death nor aggravated the pre-existing condition resulting in injury or death.... If the administrative law judge finds that the Section 20(a) presumption is rebutted, he must weigh all of the evidence and resolve the causation issue based on the record as a whole.

BRB No. 96–1218 at 3–4 (Jan. 19, 1997) (internal citations omitted). Based on that understanding of the ALJ's approach, the BRB upheld the finding that AGT's evidence was insufficient to rebut the presumption, because Dr. Carroll's opinion was "based on speculation and probabilities" and he admitted he did not know anything about the cumulative effect of the amount of time Mr. Janich had been working prior to his death. The BRB then affirmed the ALJ's decisions.

### III

On appeal, AGT has presented four arguments: (1) Mrs. Janich was not entitled to the § 20(a) presumption; (2) the ALJ applied the wrong legal approach to the employer's burden of rebutting the § 20(a) presumption; (3) as a matter of fact, the employer presented enough evidence to rebut the presumption; and (4) as a matter of fact, the evidence refuting Mrs. Janich's right to benefits was so strong that the employer is entitled to judgment now. In our view, substantial evidence supports the ALJ's decision to invoke the § 20(a) presumption in favor of Mrs. Janich, for the reasons the ALJ mentioned; we therefore do not discuss that point further. Similarly, we think it clear on this record that the evidence was not so one-sided that AGT would be entitled to judgment here and now, and we therefore reject its fourth point. That leaves points 2 and 3, which require full exposition.

### A. *What an Employer Must Do To Rebut the § 20(a) Presumption*

Our starting point for considering exactly what an employer must do to rebut the § 20(a) presumption, and where that leaves this case, is the language of the statute. It is simple and straightforward:

> In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary—
>
> (a) That the claim comes within the provisions of this chapter.

33 U.S.C. § 920. As a first cut, this language has been interpreted to mean that the claimant must establish her *prima facie* case, and then the "burden" shifts to the employer to show that "substantial" evidence exists that indicates that the claim does not fall within the statute. Embedded within that statement, however, are two fundamental questions: first, what kind of burden shifts to the employer, a burden of production or a burden of persuasion; and second, what quantity or quality of evidence is enough to satisfy

that burden, whether it relates to production or persuasion.

As early as 1935, the Supreme Court used language in a decision under § 20 of the LHWCA that strongly suggested that the statute shifts a production burden to the employer, not a persuasion burden, albeit in the context of the section of the Act forbidding compensation if an injury is self-inflicted. In *Del Vecchio v. Bowers*, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229 (1935), the Court wrote as follows:

> ... the claimant, in the absence of substantial evidence to the contrary, shall have the benefit of the presumption of accidental death. The employer must rebut this *prima facies*. The statement in the act that the evidence to overcome the effect of the presumption must be substantial adds nothing to the well understood principle that a finding must be supported by evidence. Once the employer has carried his burden by offering testimony sufficient to justify a finding of suicide, the presumption falls out of the case. It never had and cannot acquire the attribute of evidence in the claimant's favor. Its only office is to control the result where there is an entire lack of competent evidence.

*Id.* at 286, 56 S.Ct. 190 (footnotes omitted). Years later, in *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court addressed a closely related problem: the validity of the Department of Labor's "true doubt" rule, under which it found for the claimant in cases where the evidence (apart from presumptions) was evenly balanced. The Court found that the "true doubt" rule violated § 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d). *Id.* at 281, 114 S.Ct. 2251. In the course of so ruling, it necessarily decided that both APA § 7(c) and the LHWCA (because § 7(c) applies to adjudications under the Act) require the claimant to bear the ultimate burden of persuasion in these cases. See *id.* at 271, 114 S.Ct. 2251.

At least in terms of the way the responsibilities of the litigants develop over the course of a proceeding (as opposed to the specific requirements imposed by this statute on the evidence the employer must produce), we think this area is analogous to the familiar burden-shifting approach used in employment discrimination cases. See, *e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under *McDonnell Douglas*, the plaintiff's establishment of a *prima facie* case establishes a judge-made presumption that the employer unlawfully discriminated against the employee. The defendant employer then has the burden of producing evidence that the adverse action was taken for a legitimate, nondiscriminatory reason, by " 'clearly set[ting] forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's*, 509 U.S. at 507, 113 S.Ct. 2742, quoting from *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089 (emphasis in original). Once the employer has met that burden of production, the Court held in *St. Mary's*, the presumption dissolves and the plaintiff is left with the ultimate burden of persuasion on the evidence as a whole, in keeping with Fed.R.Evid. 301.

■ *Del Vecchio* and *Greenwich Collieries* tell us that exactly the same approach governs the adjudication of LHWCA cases in which the statutory presumption of § 20(a) is invoked. The only difference between the LHWCA cases and the *McDonnell Douglas* line of cases is that the latter have a judicially created presumption, while the presumption is statutory in the former. But once we know from *Greenwich Collieries* that the burden of persuasion rests at all times on the

claimant, by force of APA § 7(c), it is plain that the source of the presumptions makes no difference. We therefore hold that the burden in LHWCA cases that shifts to the employer is a burden of production only.

■ Next, we must decide how much evidence the employer must produce in order successfully to rebut the presumption—or, in Professor Thayer's more colorful phrase, burst the bubble and require the plaintiff to prevail solely on the evidentiary record without the benefit of any presumption. See 2 McCormick on Evidence § 344 (4th ed.1992); see also 9 Wigmore on Evidence § 2487(d). Here § 20(a) on its face gives more guidance than the Supreme Court did in the employment discrimination cases: it requires "substantial evidence" to the contrary. Because the term "substantial evidence" occurs in a number of different contexts, see *Steadman v. SEC*, 450 U.S. 91, 100, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981), we must decide what it means as it is used in § 20(a).

■ As an initial matter, it is useful to distinguish between two closely related concepts that are often linked in administrative review cases: first, "substantial evidence," and second, a "preponderance of the evidence." The Supreme Court clarified the difference between the two ideas in *Steadman*. The term "preponderance of the evidence," the Court explained, relates to "the degree of proof which must be adduced by the proponent of a rule or order to carry its burden of persuasion in an administrative proceeding." 450 U.S. at 95, 101 S.Ct. 999. If that degree is a preponderance, then the initial trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question. If that degree is "clear and convincing evidence" or "beyond a reasonable doubt," then the trier of fact must find that the evidence ever more forcefully establishes the proposition. But it is well established that the initial trier of fact, whether it is an administrative agency, a trial court, or a jury, does not simply stack up quantities of evidence on both sides and see which pile is higher. One compelling witness, or one "smoking gun" document, can overwhelm ten contrary witnesses or a raft of papers, if the trier of fact chooses to believe the one witness and to disbelieve the ten, or it credits the one document and finds the collection wanting.

The critical point is thus whether the evidence that the trier of fact chooses to believe is substantial enough in quantity to support the finding that was made. In *Steadman*, the Court was considering a statute that allowed sanctions to be imposed under the securities laws only when they were in accordance with substantial evidence. It held there that "[t]he word 'substantial' denotes quantity. The phrase 'in accordance with ... substantial evidence' thus requires that a decision be based on a certain quantity of evidence." 450 U.S. at 98, 101 S.Ct. 999 (footnote omitted). It also noted that the statute's requirements for relevance, as well as the need to rest a decision on reliable and probative evidence, added a qualitative dimension to § 7(c) as well—a dimension equally applicable here, given the *Greenwich Collieries* holding that § 7(c) applies to LHWCA cases. See *Steadman*, 450 U.S. at 98 n. 17, 101 S.Ct. 999.

There are many phrases well known to the law that attempt to describe exactly how much evidence is "substantial" enough to justify a particular result. For example, in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Supreme Court described it as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 401, 91 S.Ct. 1420, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). See also *Pierce v. Underwood*, 487 U.S. 552, 564, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir.1999); *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir.1998). In this case, we are talking about the amount of evidence an employer must pro-

duce in order to rebut a presumption, rather than the amount a proponent of a rule must introduce in order to sustain a favorable ruling on appeal. Nevertheless, the purpose for which the evidence is being introduced has no necessary connection to the amount of evidence needed to serve that purpose. We note also that the Supreme Court articulated much the same standard for the employer's burden of production in an employment case in *St. Mary's*, where it imposed on the employer the responsibility of introducing, through admissible evidence, "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." 509 U.S. at 507, 113 S.Ct. 2742 (emphasis in original). That is the same thing as requiring the employer to introduce "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See also *Del Vecchio*, 296 U.S. at 286, 56 S.Ct. 190 ("Once the employer has carried his burden by offering testimony sufficient to justify a finding of suicide, the presumption falls out of the case."). Just as in *St. Mary's*, this does not mean that any burden of persuasion has shifted to the employer. To the contrary, it describes the evidence that the employer both in LHWCA cases and in employment cases must introduce in order to dissipate a presumption favorable to the plaintiff. Once such evidence is in the case, the presumption disappears and the trier of fact must decide the case based solely on evidence of record.

### B. *Whether This Employer Successfully Rebutted the § 20(a) Presumption*

■ In this case, the ALJ described the "substantial evidence" burden of the employer as a requirement of introducing "specific and comprehensible evidence, not speculation," before the § 20(a) presumption would be defeated. We see nothing inconsistent in this formulation with the standards we have discussed above; a requirement of specificity is not the same

thing as a shift in the burden of proof. Indeed, we routinely reject vague and speculative affidavits when they are submitted by a party seeking to defeat a motion for summary judgment that has been filed against it. See *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir.1998); *Drake v. Minnesota Mining and Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). Just as in *Del Vecchio* and *St. Mary's*, the employer here had to introduce admissible evidence that, if believed, would have supported a finding in its favor. The ALJ simply found that Dr. Carroll's testimony was so hedged and speculative that it did not, even taking it at face value, undercut Mrs. Janich's *prima facie* case.

■ We agree. The scope of our review of an administrative decision is limited. When considering an appeal from the BRB, we evaluate the propriety of the ALJ's underlying decision. In so doing, we ask whether the ALJ's decision is "supported by substantial evidence, in accord with the law, and not irrational." *Lovilia Coal Co. v. Williams*, 143 F.3d 317, 322 (7th Cir.1998). See also *Zeigler Coal Co. v. Kelley*, 112 F.3d 839, 841 (7th Cir.1997); *Morehead Marine Services, Inc. v. Washnock*, 135 F.3d 366, 370 (6th Cir.1998) (when evaluating administrative decisions, the courts of appeals review legal conclusions *de novo* but must affirm findings of fact and conclusions drawn therefrom if supported by substantial evidence). A decision based solely on Dr. Carroll's statements would not have had the support of substantial evidence in the record. True, Dr. Carroll said that he was confident that Mr. Janich's occupation and work did not cause his death, but the doctor also said in effect that he had no idea what work Mr. Janich had been performing in the days and weeks leading up to his death. Thus, this was not simply a problem of the doctor's indicating that he could rule out one cause of death while he remained unable to

pinpoint a different cause. Deeper evidentiary flaws existed with Dr. Carroll's testimony, and since the employer came forth with nothing else that filled in the gaps, the ALJ was entitled to find that AGT did not introduce substantial evidence to rebut the § 20(a) presumption of coverage.

The only potential fly in this ointment is the possibility that the ALJ might have wrongly thought that the burden of persuasion shifted to the employer, not just a burden of production. While the record is not as clear as might be ideal, we believe that he did not make this mistake at the critical time, nor did the BRB review the case on that erroneous legal assumption.

■ As we spelled out in some detail above, in his original opinion the ALJ articulated exactly the right set of standards for this case. He wrote that once the claimant establishes a *prima facie* case, the burden shifts to the employer "to go forward with countervailing evidence to rebut the presumption." He went on correctly to note that if the employer did so, "the presumption is rebutted, it drops from the case and the claim must be decided on the record as a whole." He then spoke of the employer's need to "*produce* specific and comprehensive evidence, not speculation, to overcome the presumption that working conditions caused the injury or death." (Emphasis added.) Thus, at the time he made the critical finding that the employer had failed to produce this type of evidence, there is nothing at all to criticize in his formulation of the governing legal standard.

■ Unfortunately, when the ALJ wrote his brief opinion on the motion for reconsideration, his language was contradictory. At one point he indicates that he "agree[s] with Employer that the presumption created by Section 20(a) is a 'bursting bubble' insofar as it drops from the case once it is rebutted." Only shifting burdens of production make bubbles burst in this sense, and thus the logic of that sentence does not suggest any error.

A page later, however, he refers to a BRB decision, *Kubin v. Pro–Football, Inc.*, 29 BRBS 117 (1994), which he said requires the burden of *proof* to shift to the employer—although that was dicta even in *Kubin*, because the evidence there too was speculative and equivocal. If by that reference the ALJ was shifting ground and implying that the burden of persuasion moved to the employer once the § 20(a) presumption is invoked, he was wrong. But the error, if any, was harmless. The ALJ had the right standard in mind when he assessed the employer's evidence in the original opinion. Last, we note that the BRB did not cite *Kubin* in its opinion, nor did it misstate the legal rule. To the contrary, it too spoke of the employer's burden on rebuttal to "present specific and comprehensive evidence sufficient to sever the causal connection between the injury and the employment." It then correctly stated that if the presumption was rebutted, the ALJ had to "weigh all of the evidence and resolve the causation issue based on the record as a whole."

## IV

We are therefore satisfied that legal error did not infect the ALJ's findings about the quality of AGT's rebuttal evidence. We therefore AFFIRM the decision of the BRB awarding benefits to Mrs. Janich.

POSNER, Chief Judge, with whom Judges COFFEY, EASTERBROOK, and MANION join, dissenting.

I agree that the burden of persuasion remains on the claimant, but I disagree that the administrative law judge was entitled to regard Dr. Carroll's evidence as too insubstantial to satisfy the employer's burden of production. The isolated passages that the administrative law judge and this court quote from Dr. Carroll's 72–page deposition give a misleading impression of the deposition as a whole. Carroll, a highly qualified cardiologist, opined that Janich had a type of heart condition, involving potentially fatal arrhythmias, that had

caused his death, and that this type of arrhythmia (ventricular arrhythmia) is aggravated by neither mental stress nor physical exercise. He may be wrong, but neither the agency nor this court addresses that issue. The suggestion that Carroll's testimony lacked specificity or authority will not persuade anyone who has read his deposition carefully.

Dr. Carroll acknowledged that since there had been no autopsy and he had not been with Janich when he died, his opinion about the cause of Janich's death was inherently "speculative," a word that he was using not to denote the class of evidence that a tribunal might refuse to credit, but merely to acknowledge the limitations of medical science. Had he opined with greater definitiveness, his opinion would have been suspect. Apparently no honest medical opinion in the employer's favor would carry any weight with this administrative law judge.

Bias to one side, in dismissing Carroll's evidence as "speculative" the administrative law judge may have committed the unpardonable sin against administrative law that we noted in *Peabody Coal Co. v. Director*, 165 F.3d 1126, 1128–29 (7th Cir. 1999): applying stricter standards of admissibility than the Federal Rules of Evidence, even though those rules, which are designed to prevent amateur factfinders (jurors) and generalist judges from going astray, are inapplicable to administrative agencies, which are supposed to have the kind of specialized knowledge that should enable them to consider evidence without wearing blinders.

Having acknowledged his inability to achieve metaphysical certainty, Dr. Carroll explained in great detail why he believed that it was indeed a ventricular arrhythmia—an arrhythmia which (and here he was emphatic) is not aggravated by mental or physical stress—that had caused Janich's death. If Carroll was right, Janich's death was completely unrelated to his employment; he would have died at the same instant had he retired six months earlier.

Carroll may be wrong, but it is untenable to suggest that his evidence was not "substantial."

Much of the deposition consisted of the opposing lawyer's describing Janich's activities in the hours before his death in hypothetical terms and asking whether these activities could have caused Janich's sudden death. To each of these questions Carroll answered no; only to the question whether Janich's working 244 hours over the course of the last 38 days of his life might have been a precipitating factor in his death did he answer "I don't know." This is the answer on which the administrative law judge and this court fasten. But the question had been interrupted by an objection to the inclusion in the question of the term "excessive hours" (which, oddly, does not appear in the transcript of the deposition), and it is likely that when Dr. Carroll said "I don't know" he was merely expressing an uncertainty about the question that had been engendered by the objection to the term "excessive hours." Since he testified repeatedly that stress and exercise were not precipitating factors in Janich's death, his "I don't know" can't be taken to be a considered response to the lawyer's hypothetical. It came moreover toward the end of the deposition and the lawyer had been bombarding him with lengthy hypotheticals for some time.

To trash his testimony on the basis of "speculative" and "I don't know" is the kind of tactic that agencies use only when they are determined to reach a preordained result willy-nilly. It is almost superfluous to add that the evidence of "stress" was extraordinarily thin. Janich worked 33 of the last 38 days of his life, which (given the total of 244 hours of work) averages out to 7.4 hours of work a day. Considering the essentially sedentary nature of his job, this was not a heavy workload, even if it did involve his working every other Saturday. Nor was his last day stressful. Janich sat in his office until someone told him to get a move on; then

he and his gang stood by while members of a different union closed the hatches. Rain is an ordinary event in this occupation; and even if the other members of the gang were scurrying about, Janich wasn't. The most one can say is that he walked out of his office and yelled. Is that the kind of event that precipitates a heart attack? Maybe; but it is hardly such a powerful inference as to justify the administrative law judge in ignoring Dr. Carroll's contrary medical opinion completely.

I think that what led the administrative law judge and now this court astray is the counterintuitive character of that opinion. "Everyone knows" that stress can precipitate a heart attack, and "stress" is such a vague term that "everyone knows" that Janich must have been under stress. But the reason everyone thinks that stress can cause a heart attack is that when a lay person thinks of heart disease he invariably thinks of coronary artery disease, the narrowing of the arteries in the heart. Coronary artery disease, which can precipitate a heart attack through a sudden blockage of a coronary artery by depriving the heart muscle of the blood it needs, can be aggravated by stress; and Janich had severe coronary artery disease. But it is not the only type of heart disease. According to Carroll, Janich's death was precipitated not by a myocardial infarction (the type of heart attack produced by the blockage of a coronary artery) but by an irregularity in the beating of Janich's heart. The condition that produced this irregularity was related to his coronary heart disease, and specifically to his previous heart attack, but there is no argument that *this* condition, the precipitator (in Carroll's opinion) of the fatal heart attack, was worsened by any emotional or physical stress that Janich may have experienced on the day of his death or on the preceding 38 days. (I am assuming here that there was substantial evidence of stress; but there was not.) I do not find in either the agency opinions or this court's opinion any recognition of the distinction that I have

been expounding, though it is the basis of Carroll's opinion.

If the Department of Labor is free to disregard medical evidence of the quality and specificity of Dr. Carroll's, it will have been empowered to read out of the statute the requirement that the worker's injury, to be compensable, have been employment-related. The case should be remanded to the Benefits Review Board with instructions to redetermine the claimant's entitlement to benefits in light of Dr. Carroll's substantial evidence to the contrary.

FLAUM, Circuit Judge, joined by MANION, Circuit Judge, dissenting.

While I fully agree with the Majority's well reasoned analysis of the 20(a) presumption, I dissent from the result because I believe that affirming the ALJ's decision undermines the very approach announced today.

As the Majority explains, the 20(a) presumption is overcome by production, not persuasion. Once the employer produces substantial evidence suggesting that the employee's death was not work-related, coverage is no longer presumed but must be proved by the claimant based on a preponderance of the record evidence. Substantial evidence in this context refers to the minimum quantity of evidence which, if believed, could support a particular decision or finding. *See Steadman v. SEC*, 450 U.S. 91, 98, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981); *Del Vecchio v. Bowers*, 296 U.S. 280, 286, 56 S.Ct. 190, 80 L.Ed. 229 (1935). As the Majority notes, this standard has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see Garvey Grain Co. v. Director, OWCP*, 639 F.2d 366, 370 (7th Cir.1981) (per curiam) ("Substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict where the conclusion sought to be drawn from it is one of fact for the jury.").

Unfortunately, I believe the ALJ did not apply this approach or standard to Janich's case. The record strongly suggests that he shifted the burden of proof to the employer and required it to do much more than produce substantial evidence in rebutting the 20(a) presumption. The ALJ, relying on the BRB's decision in *Kubin v. ProFootball, Inc.*, 29 BRBS 117 (1995), stated that, "Section 20(a), once invoked, shifts the burden of proof to the employer on the issue of causation such that the employer must prove that the disability (or death) was neither caused nor aggravated by the claimant's employment." Even if, as the Majority asserts, this statement is dicta, I do not share their confidence that the ALJ nonetheless "had the right standard in mind." On the contrary, the ALJ's assessment of AGT's evidence supports the opposite conclusion.

The BRB affirmed the ALJ, stating that his opinion had "concluded that [Doctor Carroll's] testimony did not rebut the 20(a) presumption as his opinion was based on speculation and probabilities.... As the record supports the [ALJ's] conclusion that Dr. Carroll's opinion did not unequivocally rule out a connection between decedent's employment and his death, he did not err in finding it insufficient to rebut Section 20(a)."[1] However, as Chief Judge Posner explains, the fact that the doctor's conclusion was probabilistic and called for some degree of speculation did not make it insubstantial. More revealing is the BRB's statement that Dr. Carroll failed to rebut the presumption because he could not unequivocally rule out all work-related causes of death. This conclusion may have been appropriate for a party bearing the burden of proof, but not for a party whose only burden was to produce substantial evidence. The ALJ's statement only makes sense if he (mistakenly) believed that the employer retained the burden of proof on the question of causation and had

to refute the presumption of coverage by at least a preponderance of the evidence.

Had the Majority's approach actually been followed, the ALJ would have eliminated the presumption and analyzed the case on the record as a whole, with the claimant bearing the ultimate burden of proof. This does not appear to have happened. Without necessarily accepting Judge Posner's view of the evidence's strength (nor the Majority's view of its weakness), I believe that Dr. Carroll's testimony was at least substantial. The doctor stated that due to the nature and history of Janich's heart problems, it was more likely than not that work played no role in his death. This is certainly "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420. Because AGT had produced "substantial evidence to the contrary," 33 U.S.C. § 920(a), the ALJ should have extinguished the presumption of coverage at that point.

This is not to say that the ALJ's finding of coverage was ultimately incorrect. He may well have concluded that Mrs. Janich proved by a preponderance of the evidence that Mr. Janich's work was the most likely cause of his death. But because we cannot be sure what role the improperly retained presumption played in the decision, we should remand for reconsideration consistent with the clear approach the Majority outlines today. In attempting to save the ALJ's decision by claiming that he never shifted the burden of proof and only required the employer to produce substantial rebuttal evidence, the Majority runs the risk of either creating uncertainty about its approach in future cases or of establishing a far more demanding (and novel) version of the substantial evidence standard.

---

1. It should be emphasized that the doctor's testimony, which was credited by the ALJ, was not based on speculation, but on a review of the decedent's medical history and an understanding of Janich's duties.